Filed 4/29/22  P. v. Strong CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>JOVAN STRONG,<br><br>    Defendant and Appellant. | A160880<br><br>(Solano County<br>Super. Ct. No. VCR208712) |

In 2015, appellant Jovan Strong was sentenced to 25 years to life in prison after a jury found him guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] for his involvement in the robbery of a convenience store during which his cousin, Diovanni Whitmire, shot and killed the store clerk.

In 2018, the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which amended the felony murder rule "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life" (Stats. 2018, ch. 1015, § 1, subd. (f)), and added section 1170.95 to provide a

---

[1]    Further section references are to the Penal Code unless stated otherwise.

1

procedure for vacating prior murder convictions that could not be sustained under the new definition of felony murder.

In 2019, appellant filed a petition under the new law to have his murder conviction vacated. The trial court found that appellant made a prima facie showing entitling to him to relief and held an order to show cause hearing but ultimately denied the petition. On appeal, appellant contends: (1) the trial court employed the wrong standard of proof at the order to show cause hearing; (2) the evidence did not support a finding beyond a reasonable doubt that appellant acted with reckless indifference to human life; and (3) requiring appellant to appear at the section 1170.95 hearing through the video conferencing system "Zoom" denied him his constitutional rights to a public trial and to consult privately with his counsel. In supplemental briefing, appellant argues the matter should be reversed and remanded so that the trial court may consider his youth as a factor in determining whether he acted with the requisite mental state. We will affirm the denial of the section 1170.95 petition.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

Shortly before 2:00 a.m. on February 8, 2008, two men entered a 7-Eleven store and during the course of a robbery, one of the men shot the store clerk, Surinder Kumar. Kumar was later transported to a hospital, where he died from a gunshot wound to the torso. He had been shot twice, once in the chest armpit area, and once in his thigh.

---

[2]    The facts of this case were set forth in this court's unpublished opinion in *People v. Strong* (Mar. 27, 2017, A146056 (nonpub. opn.). We reiterate these facts and add additional facts from the record as necessary.

2

In the store's surveillance video, the shooter can be seen dropping a plastic bag. The store owner reported that approximately five cartons of Newport cigarettes and $80 in cash were taken during the robbery.

Four days later, officers stopped a vehicle in which Whitmire was a passenger. In searching the car, the officers found a distinctive handgun which they recognized from the video of the robbery. DNA analysis tied Whitmire to the handgun, and forensic analysis established that the gun had fired three casings recovered at the murder scene.

In July 2008, fingerprint analysis revealed that fingerprints found on the plastic bag left by the shooter at the 7-Eleven store matched those of Whitmire, appellant, and appellant's girlfriend, I.E. Police detectives interviewed I.E. and informed her that her fingerprints, along with those of appellant and Whitmire, were on a bag recovered at the murder scene. Although I.E. denied knowing anything about the crime, she eventually told detectives that appellant had taken her car on the night of the incident, and when he returned, he said he and Whitmire had gone to " 'hit' " the 7-Eleven and Whitmire had "killed the man." I.E. told police that appellant became "teary-eyed" and said "he didn't expect Dino to do what he did."[3] I.E. also disclosed that appellant took Newport cigarettes from the store during the robbery and that she had seen about 30 or 40 packs of Newport cigarettes in a white garbage bag.

Appellant was charged by information with murder (§ 187, subd. (a)).

**A. Trial Evidence**

### 1. *Surveillance Video Footage*

The 7-Eleven store's surveillance system consisted of multiple cameras that recorded segments of video without audio. At trial, the prosecution

---

[3]     "Dino" was Whitmire's nickname.

introduced the surveillance videos and still images into evidence, while a police detective described the footage.

Whitmire entered the store at 1:54:34 a.m. and proceeded to a display near the cash register as Kumar went behind the register. Fifteen seconds later, Whitmire stood on the customer side of the cash register pointing a gun at Kumar. Approximately 10 seconds after "the robbery beg[an]," appellant entered the store. Whitmire and appellant each had plastic bags with them.

At 1:55:05 a.m., appellant stood in front of an employee storage room on the side of the checkout counter where cigarettes were displayed for sale. The door to the employee storage room was about three feet from the cigarette display.

At 1:55:08 a.m., Kumar bent over sharply, appearing to be shot.[4] At the same time, appellant opened the door to the employee storage room.

At 1:55:11 a.m., Kumar was in a hunched over position on the employee side of the checkout counter, and the cash register was closed. Three seconds later, as appellant remained by the employee storage room, Whitmire continued to point the gun at Kumar, but the cash register was now open, and the plastic bag that Whitmire had been holding was on the floor below the register.

At 1:55:23 a.m., Whitmire and Kumar went to the employee storage room and walked through the threshold of the door as appellant walked to the front of the store holding a white plastic bag.

At 1:55:32 a.m., appellant walked to the back of the store, still holding the plastic bag. A few second later, Kumar walked to the employee side of

_____

[4]     While the video footage showed no muzzle flash, appellant conceded at the section 1170.95 hearing that the video appeared to show the first shot being fired at 1:55:08 a.m.

4

the checkout counter and Whitmire walked towards appellant. Kumar was bent over at the waist as he stood next to the open cash register.

At 1:55:41 a.m., Whitmire leaned over the checkout counter and, holding the gun in his right hand, used his left hand to reach into the cash register. Kumar was still bent over, holding his midsection.

At 1:56:01 a.m., Whitmire stood on the customer side of the checkout counter with his right arm extended, pointing his gun downward. Kumar was "barely seen in the far right corner of the photograph." The cash drawer was on the floor next to a plastic bag.

At 1:56:04 a.m., Whitmire headed towards the front entrance of the store. Appellant followed two seconds later carrying a plastic bag. Kumar was lying on the ground on the employee side of the checkout counter, next to the cash drawer and a plastic bag.

The entire robbery lasted for "approximately a minute-and-a-half." No nonverbal communication between Whitmire and appellant was shown in the video footage of the robbery.

### 2. Additional Evidence

In August 2008, I.E. provided law enforcement with a letter she received from appellant dated July 31, 2008 in which appellant advised I.E. not to talk to certain individuals who "told the police Dino robbed a 7-Eleven and shot the clerk" and "got Dino in jail fighting for his life." Appellant further wrote, "you don't know nothing so you don't have nothing to worry about. As far as that night, feel me, me and you was at home sleep, and yo mom was a witness to that, feel me? . . . And if the police question you, don't talk to them without your momma there with you period. But like I said, me and you was at home sleep like on most nights, and yo mom was there like every night."

5

In November 2010, I.E. wrote a letter to the trial court and the district attorney, calling it her " 'true confession' " and apologizing for " 'telling lies to the police . . . and fabricating stories.' "  In the letter, I.E. stated that she awoke on the morning of February 9, 2008, to find appellant reading a website article about the 7-Eleven robbery.  Appellant said " 'I know who did this' " and told I.E. that Whitmire had called him the day before saying " 'he had robbed the 7-Eleven store and had to shoot the clerk and had some Newport cigarettes for [appellant.]' "  Noting that the article mentioned two suspects, I.E. asked appellant who was with Whitmire, but appellant said he did not know there were two people.  I.E. said, " 'Your cousin is crazy and you need to stop hanging out with Dino[,]' " and appellant replied that Whitmire " 'is crazy, but that's my best cousin.' "  Appellant told I.E. not to disclose what he had told her.  When they went to retrieve the cigarettes, I.E. saw that Whitmire was carrying a gun and refused to let him into her car.  Whitmire then handed appellant a bag with five to six packs of Newport cigarettes in it.  When I.E. said, " 'looks like a lot of cigarettes.  You probably did the lick with Dino,' " appellant responded that " 'he doesn't do robberies.' "  After I.E. remarked that appellant robbed houses, appellant " 'start[ed] going on and on about the difference.' "

**B. Jury Verdict**

The jury was instructed with CALCRIM 540B that appellant was charged with murder under a theory of felony murder and could be convicted "even if another person did the act that resulted in the death" if "1. The defendant committed or attempted to commit robbery; [¶] 2. The defendant intended to commit robbery; [¶] 3. If the defendant did not personally commit or attempt to commit robbery, then a perpetrator, whom the defendant was aiding and abetting, personally committed or attempted to commit robbery;

6

[¶] AND [¶] 4. While committing or attempting to commit robbery, the perpetrator caused the death of another person."

The jury found appellant guilty of first degree murder.

## C. Motion for New Trial and Sentencing

Appellant moved for a new trial based on "newly discovered evidence" that he had no knowledge of a plan to rob the store or of Whitmire's possession of a firearm.

At the sentencing hearing in July 2015, the trial court first heard testimony in support of appellant's new trial motion. Whitmire took the stand and admitted that he had shot and killed Kumar, but he testified that appellant did not enter the store to commit a robbery, did not know Whitmire was armed, and took cigarettes because Whitmire threatened him if he refused to do so.

Appellant testified that he did not know Whitmire had a gun, and that once he entered the store, he saw Whitmire point the gun at the store clerk and tell him "to put the money in the bag and he basically didn't do it." Whitmire then commanded appellant to " 'Grab the cigarettes.' " When appellant refused, "the guy end up shot, and [Whitmire] tells me 'Grab the cigarettes' again, and he tells [Kumar] to open the register again. And he does it, and my cousin reaches over the counter and gets the money. And I complied because he just shot the dude, and he's telling me to do this, so I do it." Appellant testified that Whitmire "waved the gun towards me and pointed it at [Kumar] and he goes, like 'Let's go' and he basically shoots him again, so I leave with him."

Appellant further explained that the reason he entered the store was because he saw the victim being robbed, and he went in "[t]o just basically make sure that shit didn't get out of hand. I'm not sure if it was somebody

7

else in the store. It's a high risk situation. Anybody could end up getting shot. It's a loaded firearm. And so I go in, I see there's nobody else in the store. I look in the employee room. I don't look for a safe. I don't go to take a surveillance tape. I just peer in there to see if there's somebody in there. There's not. And after that, I'm talking to my cousin, telling him to put the gun down. I probably tell him, like, we parked right in front of the store, that the car is on the camera. And at this time, he probably telling [Kumar] to put the money in the bag, telling me, like, shut up grab some cigarettes, whatever."

The trial court denied the motion, finding that the surveillance video contradicted appellant's testimony that he was under duress. Appellant appeared to be "freely moving about, taking part in the robbery, clearly going in and out, going by. There's no evidence of any type of duress. Surely, somebody being shot is shocking to most people. However, we see [appellant] move about without any impediments or reservation. [¶] So the testimony of both Mr. Whitmire and [appellant], in addition to being inconsistent with the video and inconsistent with each other, is just not believable to the Court to justify granting a new trial."

The trial court sentenced appellant to prison for 25 years to life.[5]

**D. Section 1170.95 Petition**

In February 2019, appellant filed a petition under section 1170.95 alleging he had been convicted under the felony murder rule but could not now be convicted under section 189 because he was not the actual killer, did not intend to kill, and was not a major participant who acted with reckless indifference to human life. The trial court found that appellant had made a

---

[5]     This court affirmed the judgment in *People v. Strong* (Mar. 27, 2017, A146056) (nonpub. opn.).

8

prima facie showing of entitlement to relief, appointed him counsel, and set the matter for an order to show cause hearing.

The hearings were held over the course of three days in August and September 2020. On each day, appellant appeared remotely via Zoom, while the trial court and counsel appeared personally in the courtroom. The court considered the trial transcripts and exhibits, the testimony at the 2015 hearing on appellant's new trial motion, several surveillance videos and still photographs taken from the videos, and the video and transcript of I.E.'s 2008 police interview. Following extensive argument by counsel, the court denied the petition.

The trial court first found that appellant was a major participant because "[h]e was clearly one of the robbers." Next, the court found that appellant acted with reckless indifference to human life because he "was aware of the robbery. He was aware of the firearm. And, if he wasn't before entering the store, it is quite clear Mr. Whitmire was holding that very large distinctive gun directly in the victim's presence. Pointed directly at him." Although the court observed that the evidence could reasonably suggest that appellant "did not wish or desire that the victim die," the court nevertheless found that appellant "carried on completing the robbery after not only one but two shots. . . . [I]t can't be proved that he wasn't aware of the danger and still continued on before, during, and after even in the midst of the extreme suffering of the victim that he was displaying after both shots." The court further noted that although appellant "showed some level of being distraught afterwards, . . . he also showed quite a bit of concern about his cousin being in trouble. [¶] And, when you put it all together, the only reasonable conclusion beyond a reasonable doubt, to the court, is that he was recklessly indifferent before, during, and after the robbery."

9

Appellant appealed.

DISCUSSION

## A. Senate Bill 1437

Senate Bill 1437 changed the felony murder rule and the natural and probable consequences doctrine "by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.) Section 189, subdivision (d)(3) now provides that participants in the perpetration or attempted perpetration of certain felonies (including robbery) who were not the actual killer cannot be convicted of felony murder unless they aided in the murder with the intent to kill or were "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2 [the special circumstance statute for felony murder]." Thus, the statutory requirements of section 190.2, subdivision (d), are now required to convict a defendant for felony murder itself. (*In re Taylor* (2019) 34 Cal.App.5th 543, 561 (*Taylor*).)

Senate Bill 1437 also added section 1170.95, which "allows certain people to petition their sentencing court to have their murder convictions vacated and to be resentenced on remaining counts." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7 (*Douglas*)).) To obtain vacatur of a murder conviction and resentencing, petitioners must show that they "could not presently be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(3).)

### 1. *Standard of Proof*

Appellant contends the trial court erred by employing a standard of proof akin to the substantial evidence standard of appellate review rather

10

than acting as an independent factfinder to determine whether he was ineligible for resentencing beyond a reasonable doubt.

In the wake of Senate Bill 1437's passage, appellate courts were divided as to what former section 1170.95, subdivision (d)(3) meant by "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (Former § 1170.95, subd. (d)(3).) Some courts held the prosecutor must only prove that a reasonable jury *could* find the defendant guilty of murder with the requisite mental state, which is essentially identical to the standard of substantial evidence. (E.g., *People v. Duke* (2020) 55 Cal.App.5th 113, 123, review granted Jan. 13, 2021, S265309, transferred to the Court of Appeal Nov. 23, 2021, with directions to vacate its decision and reconsider in light of Senate Bill No. 775 (Stats. 2021, ch. 551).) Other courts held that the trial court must act as an independent fact finder in a section 1170.95 proceeding and determine whether the prosecution proved the defendant's guilt under current law beyond a reasonable doubt. (E.g., *People v. Clements* (2021) 60 Cal.App.5th 597, 615, review granted Apr. 28, 2021, S267624, transferred to the Court of Appeal Dec. 22, 2021, with directions to vacate its decision and reconsider in light of Senate Bill No. 775.)

During the pendency of this appeal, the Legislature passed Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), which amended section 1170.95 to affirm that the higher standard of proof applies at a resentencing hearing. As relevant here, the legislation provides: "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1,

11

2019. . . . A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).)[6]

Although Senate Bill 775 has now clarified the applicable standard of proof, the question remains whether the trial court correctly applied this standard back in 2020. Appellant contends the court did not because the prosecutor explicitly argued that the court should deny the petition if "there is enough evidence, notwithstanding the changes to sections 188 and 189, from which a jury could potentially find [appellant] guilty of murder beyond a reasonable doubt." Notwithstanding the prosecutor's arguments, our review of the record leads us to conclude the court employed the correct standard of proof.

First, we note defense counsel correctly argued below that the standard of proof was not akin to the substantial evidence standard of appellate review and that the prosecution had the burden to show appellant's ineligibility for resentencing beyond a reasonable doubt. Our review of the hearing transcript discloses that the trial court never used the words "substantial evidence" or made any indication it was applying a sufficiency of the evidence standard. To the contrary, when the court gave the prosecutor time to make a rebuttal argument, the court stated, "I believe the People are entitled to rebuttal because the standard of proof is beyond a reasonable doubt." Then, in denying the petition, the court stated, "it can't be proved that [appellant] wasn't aware of the danger and still continued on before, during, and after

---

[6]     Senate Bill 775 applies to all cases which are not final as of the effective date of the new statute. (*People v. Montes* (2021) 71 Cal.App.5th 1001, 1006–1007.)

even in the midst of the extreme suffering of the victim that he was displaying after both shots. . . . [¶] . . . [¶] And, when you put it all together, the only reasonable conclusion *beyond a reasonable doubt*, *to the court*, is that he was recklessly indifferent before, during, and after the robbery." (Emphasis added.) These remarks demonstrate that the court did not purport to apply a substantial evidence standard in reaching its decision. Rather, "to the court," as an independent factfinder, the evidence established that appellant was recklessly indifferent to human life "beyond a reasonable doubt." Accordingly, the trial court employed the correct standard of proof under section 1170.95, subdivision (d)(3).

### 2. *Sufficiency of Evidence*

On appeal from an order denying a section 1170.95 petition, we review the trial court's factual findings for substantial evidence. (*People v. Williams* (2020) 57 Cal.App.5th 652, 663 (*Williams*).) In this court, "[t]he test is not whether the People met their burden of proving beyond a reasonable doubt that [the defendant] was ineligible for resentencing, but rather 'whether *any* rational trier of fact could have' made the same determination, namely that '[t]he record . . . disclose[s] . . . evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [as did the superior court]. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [superior court] could reasonably have deduced from the evidence. [Citation.] "Conflicts [in the evidence] . . . subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge . . . to determine the . . . truth or falsity of the facts upon which a determination depends." ' " (*Ibid.*, quoting *People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

13

Appellant concedes he was a major participant in the crime but contends substantial evidence does not support a finding beyond a reasonable doubt that he acted with "reckless indifference to human life" within the meaning of section 189, subdivision (e)(3). Because, as discussed, the statute tracks the language of the felony murder special circumstance statute (§ 190.2, subd. (d)), the California Supreme Court's decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) regarding section 190.2 are relevant to the determination of eligibility for vacatur of a murder conviction under section 1170.95. (See, e.g., *Douglas*, *supra*, 56 Cal.App.5th at p. 9; *Williams*, *supra*, 57 Cal.App.5th at p. 663.) Thus, we begin with a discussion of those cases.

In *Banks*, our high court held that section 190.2 incorporated the holdings of *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 781 (*Enmund*) that an accomplice's major participation in a felony combined with reckless indifference to human life is necessary to justify a death sentence.[7] (*Banks*, *supra*, 61 Cal.4th at p. 798.) *Banks* provided a list of factors relevant to this determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers

---

[7] As *Banks* observed, *Tison* and *Enmund* represent different points on a "continuum" of conduct, with *Enmund* involving a getaway driver sitting in a car some distance from the scene of the murders committed by his accomplices, and *Tison* involving two brothers who helped plan and carry out a prison escape of two convicted murderers by providing them weapons and aiding in their getaway by joining in the robbery of an innocent family that the escapees eventually murdered. (*Banks*, *supra*, 61 Cal.4th at p. 802.) "Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum" for eligibility of death or life without parole. (*Ibid*.)

posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Banks*, at p. 803.)

After deciding *Banks*, the Supreme Court in *Clark* considered the circumstances under which a person has acted with reckless disregard for human life—an inquiry that " 'significantly overlap[s]' " with the major participant determination.  (*Clark, supra*, 63 Cal.4th at pp. 614–615.)  *Clark* articulated the following factors to aid in this inquiry:  the defendant's knowledge of weapons and use and number of weapons; the defendant's physical presence at the crime and opportunities to restrain the crime and/or aid the victim; the duration of the felony; the defendant's knowledge of the cohort's likelihood of killing; and the defendant's efforts to minimize the risks of the violence during the felony.  (*Clark*, at pp. 618–623.)  As *Clark* made clear, "[t]he mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Id.* at p. 618.)  Rather, reckless indifference "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.)

Courts must analyze the totality of the circumstances to determine whether a defendant acted with reckless indifference to human life.  (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)  " 'No one of [the *Banks* and *Clark* factors] is necessary, nor is any one of them necessarily sufficient' " to the ultimate determination of whether an offender was a major participant

15

who acted with reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at p. 618, citing *Banks*, *supra*, 61 Cal.4th at p. 803.)

Although the trial court here did not specifically cite to *Banks* and *Clark*, the court received briefing and argument regarding both decisions, and its findings correlate to several of the relevant factors. In noting that appellant saw Whitmire holding the victim at gunpoint and shooting the victim but carried on with the robbery despite the victim's suffering, the court's findings correlated to appellant's physical presence at the scene, his awareness of the weapon and the particular dangers posed by the robbery, and his failure to restrain Whitmire and/or attempt to render aid to Kumar after lethal force had been used.

Appellant's physical presence at the scene was a significant factor, as it materially distinguishes the instant matter from nearly all the cases he cites in support of reversal. (See *Scoggins*, *supra*, 9 Cal.5th at p. 678 [defendant who planned beating and robbery was not physically present or in position to restrain shooter]); *Clark*, *supra*, 63 Cal.4th at p. 619 [defendant who planned robbery was waiting across parking lot when victim was shot]; *Banks*, *supra*, 61 Cal.4th at p. 805 [defendant was "no more than a getaway driver"]; *Taylor*, *supra*, 34 Cal.App.5th at p. 559 [getaway driver, despite making "callously indifferent" remark day after victim was killed, was parked on street, never got out of car, and could not see shooting]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1023 [petitioner did not see shooting, had no reason to know it was going to happen, and could not do anything to stop or render assistance].) By contrast, appellant's physical presence at the scene of the murder supports " 'greater culpability' " on his part. (*In re McDowell* (2020) 55 Cal.App.5th 999, 1012 (*McDowell*).)

In addition to the factors expressly cited by the trial court, the evidence could also reasonably support the inference that Whitmire and appellant had planned to rob the store. As I.E. told police, appellant said he and Whitmire had gone to " 'hit' " the 7-Eleven, which could reasonably be interpreted as synonymous with "rob," particularly in conjunction with the evidence at trial. The video evidence showed that appellant entered the store with a plastic bag 10 seconds after the robbery began and immediately went to the employee storage room area near the cigarette display where, according to his 2015 testimony, he "peer[ed] in" to "see if there's somebody in there. There was no evidence that appellant appeared taken aback to see his cousin holding the victim at gunpoint. During the robbery, appellant and Whitmire appeared to coordinate their movements without any apparent need for nonverbal communication, as appellant moved to the front of the store just as Whitmire and the victim went to the employee storage room. While appellant argues the video appeared to show him "linger[ing] in the employees' storage area, which suggested he was shocked by the sudden sound of gunfire," we do not draw such inferences in his favor in evaluating the record for substantial evidence. (*Williams*, *supra*, 57 Cal.App.5th at p. 664.) Indeed, the trial court expressly found at the 2015 hearing that the video evidence showed appellant moving about "without any . . . reservation," and a slowed down version of this same video evidence was considered at the resentencing hearing. In short, a factfinder could reasonably conclude that both Whitman and appellant planned the robbery given the evidence that the two men displayed a level of teamwork and coordination that supported the inference the robbery was planned.

Appellant emphasizes there was no evidence he knew in advance that Whitmire was armed, and in any event, his eventual awareness that

Whitmire had a gun was not sufficient to show his subjective awareness of a risk of death. It is true that one's knowledge that a robbery will involve a gun, without more, is insufficient to support a finding of reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at pp. 617–618.) Moreover, there appears to be no evidence that appellant knew prior to the robbery that Whitmire had the propensity to kill.[8] Nevertheless, a factfinder could reasonably conclude that once appellant saw Whitmire shoot Kumar the first time, he then became fully aware of the grave risk of death posed by the robbery. Indeed, appellant acknowledged at the 2015 hearing that Whitmire fired the first shot because Kumar had refused to open the cash register, which would have demonstrated to appellant that Whitmire was willing to kill in order to achieve the distinct aim of robbing the store. Rather than discourage further violence or assist the victim, appellant continued to facilitate the robbery by taking cigarettes, showing his willingness to assist in a crime that involved a grave risk of death. (See, e.g., *McDowell*, *supra*, 55 Cal.App.5th at p. 1014 [defendant became aware that planned home invasion robbery of drug dealer could turn deadly after accomplice fired warning shot].)

Appellant insists there was no evidence that he did anything to "elevate[] the risk to human life beyond those risks inherent in any armed

---

8     We reject the People's contention that the trial court could reasonably infer appellant's knowledge of Whitmire's likelihood of killing based on the fact that they were close cousins and that appellant admitted Whitmire was " 'crazy.' " (See *Banks*, *supra*, 61 Cal.4th at pp. 810–811 [though defendant was member of same gang as killer, there was no evidence they "ever participated in shootings, murder, or attempted murder"]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 405 [knowledge that shooter was gang member and "had a history of delinquency" did not support inference that petitioner could expect shooter would use deadly force].)

robbery" (*Clark*, *supra*, 63 Cal.4th at p. 623), but we conclude there was substantial evidence to the contrary. From the video footage, a factfinder could reasonably conclude that, as Whitmire and the injured victim walked to the employee storage room, appellant went to the front of the store to act as a lookout in case the first gunshot had drawn any attention. And appellant did so even after it was apparent the crime had turned deadly. Furthermore, after the victim had been shot, appellant did nothing to stop further violence or assist the victim despite being physically present at the scene. Although appellant testified at the 2015 hearing that he checked the employee storage area in order to minimize the risk of violence to others, a factfinder could reasonably reject this self-serving testimony.

Appellant maintains he had no opportunity to stop Whitmire "during the 10–15 seconds between the first and second shots, given that Whitmire was wildly waving the gun around." Again, we do not draw inferences from the evidence in appellant's favor. (*Williams*, *supra*, 57 Cal.App.5th at p. 664.) Based on the video time stamps noted at trial, a factfinder could reasonably infer that nearly a full minute elapsed between the first and second shots, during which Whitmire led the injured Kumar to the employee storage area and then back to the checkout counter, crossing paths with appellant along the way. This was sufficient time for appellant to attempt to deescalate the situation or render aid to the victim. (*McDowell*, *supra*, 55 Cal.App.5th at pp. 1005, 1012 [defendant had enough time to attempt to deescalate situation during the " 'few seconds' " between warning shot and fatal shot].)

Contrary to appellant's suggestion, the circumstance that the duration of the robbery was brief does not preclude a finding of reckless indifference. As *Clark* explained, the relevant inquiry is "[t]he duration of the interaction between the victims and perpetrators" and whether there was " 'a greater

19

window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra*, 63 Cal.4th at p. 620.) Based on the video evidence, a factfinder could reasonably conclude that the duration of the interaction between Whitmire and the victim, and the evident coordination between Whitmire and appellant as the robbery progressed, provided a sufficient window of opportunity for violence and murder.

In supplemental briefing, appellant cites two recent decisions, *In re Moore* (2021) 68 Cal.App.5th 434 (*Moore*) and *People v. Ramirez* (2021) 71 Cal.App.5th 970 (*Ramirez*), for the proposition that an offender's youth is a requisite factor in determining reckless indifference under *Banks* and *Clark*.[9] We note at the outset that appellant forfeited this claim of error by failing to raise it below. Setting his forfeiture aside, the claim is unavailing.

In *Moore*, this court held that an offender's youth—age 16 at the time of an armed robbery in which his accomplice shot the victim—along with other *Banks* and *Clark* factors weighed against a finding reckless indifference to human life, as the offender lacked " ' "the experience, perspective, and judgment" ' to adequately appreciate the risk of death posed by his criminal activities." (*Moore, supra*, 68 Cal.App.5th at pp. 439, 452, 453, citing *J. D. B. v. North Carolina* (2011) 564 U.S. 261, 272 (*J. D. B.*) and *Miller v. Alabama* (2012) 567 U.S. 460, 477 (*Miller*).) *Ramirez*, relying on *Moore*, reversed the denial of a section 1170.95 petition filed by a petitioner who was 15 years old at the time of his involvement in a fatal attempted carjacking. (*Ramirez*, at p. 975.)

---

[9] Appellant also argues in his supplemental brief that reversal is warranted in light of the passage of Senate Bill 775. As discussed above, we are satisfied that the trial court employed the correct standard of proof.

Notably, *Moore*, *Ramirez*, and the decisions they relied upon all involved minors. (See *J. D. B.*, *supra*, 564 U.S. at pp. 265, 271–272 [13-year-old's age relevant to *Miranda* custody analysis]; *Miller*, *supra*, 567 U.S. 465 [mandatory sentences of life without parole for 14-year-olds convicted of murder violated Eighth Amendment]; *Graham v. Florida* (2010) 560 U.S. 48, 52 [16-year-old's sentence to life in prison without parole for nonhomicide crime violated Eighth Amendment]; *People v. Harris* (2021) 60 Cal.App.5th 939, 944, 960 [considering 17-year-old's youth in determining whether he was major participant under § 190.2, subd. (d)].) *Moore*'s reasoning was premised on the historical assumption in the law that " 'children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them.' " (*Moore*, *supra*, 68 Cal.App.5th at p. 453, citing *J. D. B.*, at p. 273.) Here, however, appellant was 20 years old at the time of the robbery in question. Appellant cites no case supporting youth as a factor or extending the assumptions about a child's maturity and judgment for persons beyond the "point where society draws the line for many purposes between childhood and adulthood[.]" (*Graham*, *supra*, 560 U.S. at p. 74.)[10]

---

[10] *Moore* and *Ramirez* are distinguishable in additional ways. In *Moore*, the shooting during a carjacking was "sudden and unprovoked," and the prosecutor acknowledged " 'it is unlikely [Moore] could have aborted the shooting' once [the actual killer] left the car." (*Moore*, *supra*, 68 Cal.App.5th at p. 452.) Similarly, in *Ramirez*, the petitioner "had little ability to intervene given the swiftness of the events and his distance from [the shooter], who stood on the opposite side of [the victim's] vehicle." (*Ramirez*, *supra*, 71 Cal.App.5th at p. 993.) Here, in contrast, the two gunshots were separated by nearly a minute, during which appellant had the time and opportunity to prevent further violence. *Ramirez* also noted there was evidence the minor "was influenced by peer pressure" from fellow gang members to participate in the carjacking, and his age made him more

Even assuming the youth factor is not categorically limited to minors, any error in failing to consider appellant's youth was harmless. In addition to the video evidence, appellant testified at the 2015 hearing that he entered the 7-Eleven store because he knew it was a "high risk situation" involving "a loaded firearm" in which "[a]nybody could end up getting shot." Although appellant offered this testimony in an attempt to show a concern that the armed robbery not get out of hand, his admission provides additional evidence that, at the time of robbery, he appreciated the risk of death that it posed.

Considering the totality of the circumstances in the light most favorable to the prosecution under *Banks*, *Clark*, and their progeny, we conclude the finding of appellant's reckless indifference to human life was supported by substantial evidence. (*Williams*, *supra*, 57 Cal.App.5th at pp. 663–664.)

## B. Constitutional Claims

Appellant argues that requiring him to appear at the section 1170.95 hearings via Zoom deprived him of his rights to a public trial and to confer confidentially with counsel as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, and article I, section 15 of the California Constitution.

### 1. Public Trial

"Every person charged with a criminal offense has a constitutional right to a public trial, that is, a trial which is open to the general public at all times." (*People v. Woodward* (1992) 4 Cal.4th 376, 382 (*Woodward*).)

---

susceptible to such pressure. (*Ramirez*, at pp. 975, 991.) Here, there was no evidence that appellant was susceptible to peer pressure from Whitmire.

We will assume for the sake of argument that the public trial right attaches to a section 1170.95 proceeding. (See *United States v. Rivera* (9th Cir. 2012) 682 F.3d 1223, 1229 (*Rivera*) [public trial right under Sixth Amendment attaches to sentencing proceedings].) However, the People contend, and we agree, that appellant forfeited his public trial claim by failing to raise it below. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1237 [right to public trial may be forfeited by failing to object].) At no point during the section 1170.95 proceedings did appellant or his counsel object to the Zoom hearings on the ground that the use of video denied appellant his constitutional right to a public hearing.

Furthermore, even if we overlooked the forfeiture, appellant fails to demonstrate that a violation of the public trial right occurred. First, although appellant contends he was "preclud[ed] . . . from appearing in person," the record suggests it was his choice not to personally appear. On the first day of hearings, defense counsel told the trial court that appellant did not want to be transported to the court because he was "very concerned about the COVID-19 situation. So unless he changes his mind, he'll stay there." Yet, postponement of the proceedings was also not in appellant's interest, as defense counsel told the court, "My client wants to get this done."

Second, the record does not disclose that appellant was denied the minimal protections of the public trial guarantee. "The right to a public trial entitles a criminal defendant 'at the very least . . . to have his friends, relatives and counsel present, no matter with what offense he may be charged.' " (*Rivera, supra*, 682 F.3d at p. 1229.) Appellant makes no claim that his friends or relatives were prohibited from attending the hearings either in person or through Zoom. He merely suggests that a Zoom hearing is constitutionally infirm because it will likely be unavailable to those who lack

23

access to the Internet, or to those who have only one computer and must use it for virtual schooling. In the absence of any evidence (or even contention) that appellant's family or friends were prohibited from attending or viewing the proceedings in question, either by the trial court or because of access issues, appellant simply has not shown a violation of his right to a public trial.[11]

### 2. *Private Communications with Counsel*

"The right to counsel under both state and federal Constitutions guarantees a person accused of a crime not just the opportunity to hear his lawyer's advice but also to privately confide facts that may incriminate or embarrass him. [Citation.] When others can overhear attorney-client communications, there is an impermissible chilling effect on the constitutional right to counsel." (*County of Nevada v. Superior Court* (2015) 236 Cal.App.4th 1001, 1007.)

Appellant cites various instances during the section 1170.95 proceedings in support of his claim that he was deprived of his constitutional right to private communications with counsel. These include: defense counsel's unsuccessful attempt on the first day of hearings to coordinate a phone call with appellant through court staff and the prison during the

---

[11] We also note that the public trial guarantee may be rebutted "by a showing that exclusion of the public was necessary to protect some 'higher value,' such as the defendant's right to a fair trial, or the government's interest in preserving the confidentiality of the proceedings." (*Woodward*, *supra*, 4 Cal.4th at p. 383.) Here, the hearings took place when much of the world was still grappling with the global outbreak of COVID-19. Appellant fails to address this reality and how the unprecedented challenges presented by COVID-19 may have justified the use of Zoom during the proceedings. Indeed, as mentioned, defense counsel told the court appellant did not want to be transported to the court because of his concerns about COVID-19.

midday recess[12]; an incident in which the trial court paused the proceedings and advised appellant that his conversation with a correctional officer was "being broadcast in open court"; and defense counsel's momentary disappearance from the screen during the second day of hearings after counsel's computer "ran out of juice."

As with appellant's public trial claim, the People contend appellant forfeited the instant claim by failing to object on the ground that the use of Zoom violated his right to communicate confidentially with counsel. Appellant contends his counsel adequately "expressed his concern and voiced an objection" when he told the trial court, "this is the first hearing I've done of this importance without my client sitting next to me. And I remembered I'm going to be calling him over the lunch hour. . . . And one of the things I plan to ask him is if he wants to testify, because I've had people change their mind mid-trial before[.]" But far from an objection to proceeding via Zoom, this remark—which was part of defense counsel's "housekeeping" matters— was made during a conversation with the trial court about continuing the matter to a future date so that the court could conduct a more extensive review of the record before hearing argument.

A few moments later, defense counsel stated, "I assume the prison can arrange these Zoom meetings for court hearings fairly easily and fairly quickly, but I don't know that, because they restrict my private—my confidential phone calls. They didn't at the height of the COVID problem. When everybody began opening up, they began restricting my confidential phone calls. So I don't know when the prison can do it. Probably right

---

[12]     At oral argument, the People conceded there was no evidence in the record that appellant and his counsel spoke privately during the days in which counsel was at the courthouse for the section 1170.95 hearings.

away." It is unclear what counsel meant by saying the prison was "restricting my confidential phone calls," but counsel's remarks did not constitute a specific objection to having appellant continue his appearance via Zoom. And though the record shows that defense counsel was unable to speak with appellant during recess on the first day of hearings, counsel indicated his focus was to ensure appellant's ability to appear the next day by Zoom, and counsel raised no objection that the circumstances violated his client's right to attorney-client confidentiality. The transcript for the following day reflects that appellant was present "via Zoom" for the hearing.

In short, despite experiencing some technical difficulties during the proceedings, at no point did defense counsel specifically object to appellant continuing to appear by Zoom due to concerns about attorney-client confidentiality. Thus, appellant did not sufficiently object to preserve the claim for appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 434 [party must fairly state specific grounds for trial objection].) The purpose of the forfeiture doctrine is to encourage a defendant to bring errors to the attention of the trial court so that they may be corrected or avoided. (*People v. Simon* (2000) 25 Cal.4th 1082, 1103.) " ' " 'In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them.' " ' " (*People v. Saunders* (1993) 5 Cal.4th 580, 590.) Here, had appellant raised a specific and timely objection on attorney-client confidentiality grounds, the trial court could have taken any number of steps to allow for private communications between appellant and his counsel. (See, e.g., *Vasquez Diaz v. Commonwealth* (2021) 487 Mass. 336, 339 [describing Zoom " 'breakout room' function" allowing participants to have private virtual

meetings].) On this record, we conclude it is appropriate to treat the claim as forfeited.[13]

## DISPOSITION

The order denying appellant's section 1170.95 petition is affirmed.

---

[13] Appellant suggests we should overlook his forfeiture in order to avoid the necessity of a habeas corpus petition on ineffective assistance of counsel grounds. The People respond that defense counsel could have had tactical reasons not to object, as counsel knew appellant wanted the hearings to proceed without further delay but also did not want to be present in the courtroom due to COVID-19 concerns. Given the inadequacies of the record before us, we decline to reach the issue on direct appeal. We express no opinion on the merits of any habeas petition on ineffective assistance grounds based on counsel's failure to object to the use of Zoom.

_____

Fujisaki, Acting P. J.

WE CONCUR:


_____

Petrou, J.


_____

Rodrìguez, J.


A160880